UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

RUTH DUDELSON,                              :

                           Plaintiff,      :

              -against-                    :

JO ANNE B. BARNHART,                        :
Commissioner of Social Security,

                                         :

                     Defendant.
----------------------------------------------------------x

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
RICHARD C. CASEY**

03 Civ. 7734 (RCC)(FM)

**FRANK MAAS**, United States Magistrate Judge.

I.     Introduction

          Pursuant to Section 205(g) of the Social Security Act ("Act"), as amended,

42 U.S.C. § 405(g), plaintiff Ruth Dudelson ("Dudelson") seeks review of a final

decision of the Commissioner of Social Security ("Commissioner") denying her

application for disability insurance benefits. The case comes before the Court on cross-

motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons

set forth below, I recommend that Dudelson's motion be granted solely to the extent that

it seeks a remand of this case for further proceedings with respect to her claims of mental

impairment, that the Commissioner's cross-motion be denied, and that this case be closed.

II.   Background

   A.   Procedural History

      On August 31, 2000, Dudelson filed applications for disability insurance and Supplemental Security Income ("SSI") benefits in which she alleged that she was disabled.  (Tr. 26, 81-83).[1]  The disability insurance application contended that Dudelson had been disabled since March 1, 1993.  (See id. at 81).  The application for SSI was approved.  (Id. at 26; Compl. ¶ 6).[2]  The application for disability insurance was denied initially on April 20, 2001, and upon reconsideration on May 3, 2001.  (Tr. 55-57).

      In July 2001, Dudelson requested a de novo hearing before an administrative law judge ("ALJ"), which was held before ALJ Katherine C. Edgell on July 17, 2002.  (Id. at 58, 19-53).  Dudelson appeared at the hearing with her counsel, George Silver, Esq., and testified.  (See id. at 19-53).  Following the hearing, on August 30, 2002, the ALJ issued a written decision, in which she concluded that Dudelson was ineligible for benefits because she was not disabled during the relevant period, which was March 1, 1993, through March 31, 1997.[3]  (Id. at 8-10).  The ALJ's decision became the

_____

      [1]   Citations to "Tr. ___" refer to the certified copy of the administrative record filed by the Commissioner as part of the Answer.

      [2]   There is no documentation in the administrative record establishing that Dudelson's SSI application was approved.  The Commissioner, however, does not dispute this assertion.  (See Def.'s Mem. of Law in Supp. of Mot. at 14 (referring to the "fact" that Dudelson "was found disabled for purposes of her SSI claim")).

      [3]   Dudelson contended that she became disabled on March 1, 1993, which allegedly was the last day she worked.  (Id.).  The end date of her alleged disability period is a function of

(continued...)

Commissioner's final decision when the Appeals Council denied further review on July 19, 2003. (Id. at 3-4).

On October 1, 2003, Dudelson filed a timely action in this Court seeking review of the Commissioner's decision. (Docket No. 2). Thereafter the parties filed cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket Nos. 9, 14), which have been fully briefed. (Docket Nos. 15, 16, 19).

B.    Relevant Facts

1.    Background and Dudelson's Disability Claims

Dudelson was born on January 2, 1956 and was forty-six years old at the time of the ALJ's decision. (Tr. 24). She has a bachelor's degree in Business Management and has taken an additional computer programming course. (Id. at 26, 34). Dudelson testified that she had not worked for nine years prior to the hearing. (Id. at 26). When she worked, she held positions as a technical writer, tutor, researcher, and administrative assistant, and obtained her real estate license in May 1993. (Id. at 26-27). She testified that she worked as a real estate agent for several months before having surgery in July 1993, but left that employment in the fall of 1993, after returning to work

---

[3](...continued)
the Act, which requires that a claimant for disability insurance benefits must have become disabled while insured. See 42 U.S.C. §§ 423(a)(1), (c)(1). The parties agree that Dudelson's disability insured status expired on March 31, 1997. (See Tr. 22, 91). Therefore, to qualify for disability insurance benefits, Dudelson had to show she became disabled on or before that date.

for only "a few days," because she "was unable to do [her] job." (Id. at 27-28).[4]
Dudelson's only sources of income after she stopped working in 1993 were public
assistance and later SSI. (Id. at 26).

Dudelson testified that her complaints were "[p]rimarily pain, back pain,
pelvic and abdominal pain, a problem with [her] right ankle at that time, pain in [her]
knees, migraines, severe migraines, chronic respiratory infections, and asthma." (Id. at
37, 39). Dudelson further testified that she had been diagnosed with scoliosis and had
suffered from "polycycstic ovarian disease" requiring "multiple surgeries to remove the
adhesions." (Id. at 39-40). According to Dudelson, she had undergone "six major
surgeries" prior to 1993, when she had an additional operation to correct an inguinal
hernia. (Id.). Dudelson explained that this last operation led to a "lump in her groin" that
made it "very difficult for [her] to function." (Id. at 37, 39). She stated that she had
nearly constant pain, whether she was sitting, or standing, and "sometimes [she] would
have difficulty getting out of bed and just getting dressed and taking care of [herself]."
(Id. at 40).

Dudelson also testified that she tore a ligament in her ankle in 1987 and,
again, in 1994. (Id. at 46). As a result, Dudelson "was pretty much confined to the
home" and unable to work throughout 1994. (Id.). She consequently was evicted from

---

[4]     In a June 2, 2000, report, Dudelson listed the date that she became unable to work
as March 1, 1993, yet also stated that she stopped working as a real estate agent in April 1994.
(Id. at 95-96). For present purposes, I have assumed, as Dudelson testified, that the last time she
was able to work was "the fall of 1993." (Id. at 28).

4

her apartment in "mid-June" of 1997 and declared bankruptcy that same year. (Id. at 48).

Dudelson testified that sometime in 1999, while she was living in a homeless shelter, she

began to see a psychiatrist because she was withdrawn and depressed, and had

"occasional outbursts." (Id. at 49).

Dudelson also testified that her current physician was treating her for

depression and anxiety, for which he had prescribed medication. (Id. at 43). She reported

that her symptoms included being "withdrawn, [having] occasional outbursts," and

experiencing depression about her "medical symptoms." (Id. at 49). At the time of the

hearing, Dudelson was seeing a psychiatrist even though the anti-depressant medication

originally had been prescribed by her treating physician. (Id. at 44).

Dudelson testified that she lived alone in a fourth-story walk-up during the

period for which she was seeking benefits, and that she was living alone in a different

apartment at the time of the hearing. (Id. at 23). She reported that she did not clean

dishes because she used paper plates, and that "a friend . . . took [her] laundry out once,

[but] after that [she] was sending it out." (Id. at 45-46). Dudelson testified that she

"occasionally" went out, but that, during the relevant time period, she "was pretty much

confined to the home." (Id. at 46-47). At the time of the hearing, Dudelson walked with

a cane. (Id. at 108).

2.    Medical Evidence[5]

    a.    Physical Impairments

In 1983, Dr. Robert B. Hunt began treating Dudelson at Brookline Hospital

in Massachusetts for "abdominal pain," which he diagnosed as having been caused by

"major pelvic adhesions," and a "right indirect inguinal hernia."  (Id. at 165, 169; see also

id. at 205 (Hunt billing statement)).  In a June 2, 1983, letter to Dudelson, Dr. Hunt wrote

that she would probably eventually need surgery to repair the adhesions but that he

"would like to delay this closer to the time [she] would like to have children."  (Id. at

206).

In 1987, at Dr. Hunt's suggestion, Dudelson consulted a specialist, Dr.

Elliot Rivo, "regarding [her] persistent left pelvic pain."  (Id. at 193).  When her condition

did not improve, Dudelson obtained a second opinion from Dr. John Quagliarello, who

advised her to have surgery.  (Id. at 197, 359).  Subsequently on July 15, 1986, and

December 22, 1987, Dr. Hunt performed procedures at Brookline Hospital to repair

Dudelson's pelvic adhesions.  (Id. at 119, 127).  Although he originally had listed

Dudelson's "chief complaint" as "abdominal pain," (id. at 122, 165), in his discharge

summary, Dr. Hunt wrote that Dudelson "had long standing pelvic pain," and his final

_____

    [5]    Much of the medical documentation in the administrative record relates to matters
occurring before or after the period for which disability insurance benefits are sought for
Dudelson's physical impairments, which is March 1, 1993 through March 31, 1997.  In analyzing
this aspect of Dudelson's claim, I have considered documents concerning the period prior to
March 1, 1993.  The documents relating to the subsequent period may be found at id. 247-53,
259-313, 328-38, 370-75, 390-537.

diagnosis was "pelvic adhesions and pneumonia." (Id.) (block capitalizations omitted).

After each surgery, Dr. Hunt prepared a report which indicated that "[Dudelson] tolerated

the procedure well and left the operating room with excellent vital signs." (Id. at 120,

128). Additionally, in a July 16, 1986, follow-up letter to Dudelson, Dr. Hunt wrote that

at "the conclusion of the [first] procedure, the pelvic structures appear[ed] to be in

excellent condition." (Id. at 195).

Billing records indicate that Dudelson also consulted Dr. Austin

Wertheimer in Massachusetts between October 4, 1989 and July 2, 1993. (Id. at 208-14).

Although the record does not contain any detailed information regarding Dudelson's

visits to Dr. Wertheimer, the bills list diagnoses for "abdominal pain" and "premenstrual

syndrome." (Id. at 208-10, 212, 214).

Dudelson's only other treating physician during the period for which

benefits are sought was Dr. Stephen Siegel, a cardiologist who had been Dudelson's

primary care physician for some time. (Id. at 38). During a visit to him on March 9,

1995, Dudelson complained of variable dull pain she attributed to her hernia surgery. (Id.

at 344). Dr. Siegel's notes of Dudelson's visit indicate that she also claimed to be

suffering from nausea, vomiting, diarrhea, chest pain, swelling, dizziness, weight loss,

and general fatigue. (Id.). Dr. Siegel's diagnosis was that Dudelson had gastritis and

bronchitis. (Id.). A radiologic consultation undertaken that same day at Dr. Seigel's

request indicated that her "lungs were clear of infiltrates," and the impression was "[n]o acute cardiopulmonary pathology." (Id. at 343).

On March 25, 1996, Dr. Siegel prepared a "To Whom it May Concern" letter, in which he indicated that Dudelson had "numerous medical problems including allergies and respiratory difficulties." (Id. at 342). He suggested that her "physical activities need[ed] to be limited, and her work environment need[ed] to be controlled" to prevent exposure to dust and temperature extremes. (Id.). Additionally, he wrote that Dudelson was "unable to lift or push heavy weights." (Id.).

On April 12, 1996, Dr. Siegel completed a Medical Assessment of Employability form in which he indicated that Dudelson was "[e]mployable with [l]imitations." (Id. at 341). For example, Dr. Siegel noted that Dudelson was not able to bend or carry heavy objects, but could walk, carry light objects, and stand for short periods of time. (Id.). Dr. Siegel further indicated that she was not limited in her ability to perform fine manipulations or push or pull light objects. (Id.). In a handwritten note, Dr. Siegel added that Dudelson was "sensitive to environmental allergens such as dust, heat, [and] humidity." (Id.).

In another "To Whom it May Concern" letter dated February 7, 1997, Dr. Siegel indicated that Dudelson was "unable to work from January 26, 1997, to February 19, 1997" due to "worsening migraine headaches as well as asthmatic bronchitis." (Id. at

339).  A bill for services rendered by Dr. Siegel during this period contains diagnosis codes for chronic bronchitis, gastritis, asthma and arthritis.  (Id. at 352).

> b.     Mental Impairment

Dudelson testified that she sought psychiatric treatment in the late 1980s and early 1990s and "was seeing somebody" at the time of the hearing.  (Id. at 43, 44).  She testified further that she sought the services of a psychiatrist when she was living in a homeless shelter in 1999.  (Id. at 49).

In a "To Whom it May Concern" letter dated June 24, 1987, Dr. Siegel stated that Dudelson's apartment had been robbed in April 1987.  (Id. at 354).  He indicated that she was "severely depressed," and "in a very tense emotional state requiring anti-anxiety medication," and he urged that she be given appropriate consideration.  (Id.).

In a report prepared on or about April 11, 2001, for the New York State Office of Disability Determinations, Dr. Craig Serin of the Jacobi Medical Center, indicated, in response to a question asking whether his "patient ha[d] displayed any behavior suggestive of a significant psychiatric disorder," that Dudelson "was being followed by Jacobi psychiatry," and that the person to contact was "Ms. Megan McGhee, MSW."  (Id. at 371) (emphasis added).  A Clinical Evaluation form completed by Ms. McGee on March 16, 2000, stated that Dudelson had reported "feeling depressed for more than 10 years," during which she displayed such symptoms as disturbed sleep, decreased energy and motivation, and feelings of hopelessness, although there were also

"a few periods . . . in which she ha[d] increased energy [and] less need for sleep." (Id. at

218). During the latter periods, however, she also found her "thoughts racing," and

engaged in "excessive cleaning and beginning projects." (Id.).

In a report prepared on October 4, 2000, Ms. McGee diagnosed Dudelson

as suffering from "Bipolar Disorder - Episodes of Mania and Depression 296.36." (Id. at

267). In the same report, Ms. McGee opined that Dudelson was "unable to function in a

work environment due to her severe depression and mania."[6] (Id. at 267).

Dr. Timothy Dutta, who examined Dudelson at the New York Hospital-

Cornell Medical Center in January 2000, indicated in a progress note that Dudelson was

"disorganized," that she had multiple doctors and . . . surgeries," and that she had been

referred to the center because her gynecologist was concerned that she might be suffering

from depression. (Id. at 308). In another report, dated October 26, 2000, Dr. Harry

Wakslak, a clinical psychologist, stated that Dudelson had a "significant" psychiatric

---

[6]     The "DSM" diagnosis code cited by McGee actually relates to "Major Depressive
Disorder, Recurrent, In Full Remission. See Diagnostic and Statistic Manual of Mental
Disorders Text Revision ("DSM-IV-TR") 860 (4th ed. 2000) (emphasis added). The first three
digits of bipolar disorders are also 296. (See id. at 348, 392). Because of the miscoding, it is not
clear exactly what Ms. McGee's diagnosis was. However, "[t]he essential feature of Bipolar I
Disorder is a clinical course that is characterized by the occurrence of one or more Manic
Episodes" in individuals who often "have also had one or more Major Depressive Episodes."
(Id. at 382). "The essential feature of a Major Depressive Episode is a period of at least 2 weeks
during which there is either depressed mood or the loss of interest or pleasure in nearly all
activities . . . ." (Id. at 349).

        Whatever the proper diagnosis code was, Ms. McGee's report makes it clear that
she considered Dudelson to have a major disability which was permanent, but which could be
substantially reduced by treatment. (See Tr. 267).

history and currently was taking "Wellbutrin and trazodone" (both of which are anti-depressants).[7] (Id. at 230). Dudelson also told Dr. Wakslak that there was "some consideration of her being placed on Depakote" (a drug used to treat bipolar disorder).[8] (Id.). In this same report, although the psychologist "[r]ule[d] out bipolar disorder," he listed his impression as "dysthymia."[9] (Id. at 232). On October 2, 2000, however, Dr. Matthew Love of the Adult Primary Care Service at Jacobi Medical Center diagnosed Dudelson as suffering from depression. (Id. at 260). Similarly, an Internal Medicine Evaluation prepared by Dr. Steven Rocker of HS Systems, Inc., on October 26, 2000, listed a "history of depression" as one of his impressions. (Id. at 237).

3. ALJ's Decision

Following the hearing, ALJ Edgell found that Dudelson had not engaged in any substantial gainful activity since March 1, 1993, and "had a combination of 'severe' impairments" during the period for which disability was claimed. (Id. at 13). She concluded, however, that Dudelson's impairments did not meet the criteria for any of the

_____

[7]    See Physician's Desk Reference ("PDR") 1486 (55th ed. 2001) ("Wellbutrin is indicated for the treatment of depression."); http://www.rxlist.com/cgi/generic/traz.htm ("Trazodone hydrochloride is an antidepressant.").

[8]    See PDR at 433 ("Depakote is indicated for the treatment of the manic episodes associated with bipolar disorder.").

[9]    The essential feature of a Dysthymic Disorder is a "Chronically depressed mood that occurs for most of the day more days than not for at least two years." DSM-IV-TR at 376.

impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Id.). The ALJ also

found that during the relevant time period, Dudelson

> retained the residual functional capacity to sit for 6 hours in
> an 8 hour work day, stand and walk for 2 hours in an 8 hour
> work day, [and] lift and carry . . . objects weighing 10 pounds
> occasionally and 5 pounds frequently. In addition, this
> residual functional capacity was diminished by an inability to
> be exposed to extreme respiratory irritants.

(Id. at 16). The ALJ also observed that Dudelson's "allegations regarding her limitations

during [the period for which disability benefits were sought] were not totally credible,"

and that Dudelson had "a lesser degree of symptoms and higher degree of functioning

than asserted." (Id. at 10-11). Based on these findings, the ALJ determined that

Dudelson was able to perform her past sedentary work as a technical writer during the

period for which benefits were sought and, as such, was not disabled within the meaning

of the Act. (Id.).

     In the course of her decision, the ALJ made no mention of Dudelson's

claim that she suffered from depression or any of the records which listed depression as a

diagnosis. (See id. at 8-18).

III.    <u>Applicable Law</u>

    A.    <u>Disability Determination</u>

    A "disability" is defined in the Act as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). In making a determination as to a claimant's disability, the

Commissioner is required to apply the familiar five-step sequential process set forth in 20

C.F.R. §§ 404.1520 and 416.920. The Second Circuit has described that process as

follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not,
> the [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the claimant
> suffers such an impairment, the third inquiry is whether, based
> solely on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations. If the
> claimant has such an impairment, the [Commissioner] will
> consider him disabled without considering vocational factors
> such as age, education, and work experience . . . . Assuming
> the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment,
> he has the residual functional capacity to perform his past
> work. Finally, if the claimant is unable to perform his past
> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)). Accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof with respect to the first four steps of

this process. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the

Commissioner finds that a claimant is disabled or not disabled at an early step in the

process, she need not proceed with any further analysis.  Williams v. Apfel, 204 F.3d 48,

49 (2d Cir. 2000).  However, if the analysis reaches the fifth step of the process, the

burden shifts to the Commissioner to show that the claimant is capable of performing

other work.  DeChirico, 134 F.3d at 1180.

      B.    Standard of Review

      Under Rule 12(c) of the Federal Rules of Civil Procedure, a party is entitled

to judgment on the pleadings if it establishes that no material facts are in dispute and that

it is entitled to judgment as a matter of law.  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d

639, 642 (2d Cir. 1988); Caraballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 213

(S.D.N.Y. 1999).

      The Act, in turn, provides that the "findings of the Commissioner as to any

fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g); see

Richardson v. Perales, 402 U.S. 389, 401 (1971); Veino v. Barnhart, 312 F.3d 578, 586

(2d Cir. 2002); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial"

does not require that the evidence be overwhelming, but it must be "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion."  Richardson, 402 U.S. at 401 (quoting Consol. Edison Co. of

N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)) (internal quotation marks omitted).

      A reviewing court is not permitted to review the Commissioner's decision

de novo.  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Jones v. Sullivan, 949 F.2d

57, 59 (2d Cir. 1991); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980). Rather, where

the Commissioner's determination is supported by substantial evidence, the decision must

be upheld. See Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); Ortiz v. Barnhart,

No. 00 Civ. 9171 (RWS), 2002 WL 449858, at *4 (S.D.N.Y. Mar. 22, 2002).

Although one would expect the deferential "substantial evidence" standard

to result in frequent judicial affirmances of the Commissioner's decisions, disability

determinations have in fact proved to be "surprisingly vulnerable to judicial reversal."

Thomas v. Barnhart, No. 01 Civ. 518 (GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct.

30, 2002). As Judge Lynch explained in Thomas:

> This vulnerability results primarily from the creation by the
> Commissioner, and the enforcement by the courts, of a variety
> of procedural obligations to which ALJs must scrupulously
> adhere. Failure to do so is treated as "legal error" permitting
> reversal of the ALJ's decision. For example, the substantial
> evidence standard might lead one to expect that a district
> court must affirm the decision of an ALJ who accepts the
> medical judgment of a consultative physician who
> unequivocally finds a claimant fit for work. Yet, the
> Commissioner has adopted regulations that give greater, and
> under some circumstances controlling, weight to the opinion
> of a claimant's treating physician, and set forth a particular
> methodology that must be followed in deciding whether to
> accept or reject such an opinion . . . .
>
> In light of rules such as these, a district court reviewing a
> benefits denial may not simply accept the administrative
> determination because a cursory review of the record reveals
> plausible testimony or documentary evidence or expert
> opinion that supports the administrative determination.
> Rather, the record must be carefully evaluated to determine

whether the Commissioner fully complied with all the
relevant regulations.

Id.

IV.   Discussion

    A.   Residual Functional Capacity ("RFC") Assessment

Dudelson contends that the Commissioner's finding that she has sufficient
RFC to engage in sedentary work of the type that she previously performed is not
supported by substantial evidence.  Specifically she argues that the ALJ failed to
(1) accord proper weight to the opinions of her treating physicians, (2) give adequate
consideration to her non-exertional impairments, or (3) weigh properly the credibility of
her testimony regarding her pain.  (Pl.'s Reply Mem. of Law ("Pl.'s Reply Mem.") at 4-
21).  She urges the Court to cure these defects by  remanding this case solely for the
purpose of calculating benefits.  (Id. at 22-23).

    1.   Opinions of Treating Physicians

Dudelson first contends that the ALJ "disregarded significant relevant
findings of [her] treating physicians, [which] strongly support[ed] the conclusion that
[her] medically determinable impairments prevent[ed her] from performing her past
relevant work during [the relevant time period]."  (Id. at 4).  She cites the findings of Dr.
Siegel, who concluded that Dudelson was incapable of performing sedentary work, as an
opinion that the ALJ "improperly rejected."  (Id. at 5).

An ALJ is required to give a treating physician's medical opinion controlling weight if it is well-supported by medical findings and not inconsistent with the other substantial evidence in the administrative record. See Rosa, 168 F.3d at 78-79; Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). An ALJ who does not give the treating physician's medical opinion controlling weight must provide "good reasons" for that decision and explain the factors that were applied to determine the amount of weight given to the opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Among the factors the ALJ must consider are the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the extent to which the opinion is supported by medical and laboratory findings, the physician's consistency with the record as a whole, and whether the physician is a specialist. Id. §§ 404.1527 (d)(2)(i) & (ii), (3)-(6); 416.927(d)(2)(i) & (ii), (3)-(6). However, the ALJ is not required to give controlling weight to a treating physician's opinion as to the ultimate issue of whether the claimant meets the statutory definition of disability. Id. §§ 404.1527(e)(1) & (3); 416.927(e)(1) & (3). See also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (quoting 20 C.F.R. § 404.1527(e)(1)). If the ALJ fails to apply the correct standard in weighing a treating physician's opinion and fails to give good reasons for rejecting the opinion, a remand for further fact finding is the appropriate remedy. Schaal, 134 F.3d at 506.

Here, the ALJ's decision indicated that she did, in fact, accord weight to Dr. Siegel's opinion that Dudelson was "capable of performing some work activity." (Tr. 15). Indeed, the ALJ's findings that Dudelson "retained the residual functional capacity to sit for six hours, and stand and walk for two hours during an 8 hour work day" were almost the same as Dr. Siegel's findings in a March 2001 report prepared for the New York State Office of Temporary and Disability Assistance Division of Disability Determinations.[10] (Id. at 315-23). The ALJ also expressly relied on the employability assessment form completed by Dr. Siegel in April 1996, in which, according to the ALJ, the limitations listed were described as "basically consistent" with Dudelson's ability to perform sedentary work. (Id. at 14; see also id. at 341).

The ALJ's findings that Dudelson could frequently lift and carry objects weighing five pounds and that her "residual functional capacity was diminished by an inability to be exposed to extreme respiratory irritants" also were supported by the series of "To Whom it May Concern" letters that Dr. Siegel wrote on behalf of Dudelson in 1996, 1998, 1999, and 2000. (See id. at 342, 337, 335, 332). Despite the lengthy period covered by these letters, the only time Dr. Siegel contended that Dudelson was unable to work was in February 1997, when he indicated that she would not be able to work from January 26, 1997, to February 19, 1997, because of her "worsening migraine headaches" and "asthmatic bronchitis." (Id. at 339). That period of approximately three weeks

---

[10]     Dr. Siegel found that Dudelson had the ability to sit for "less than" six hours per day. (Id. at 313) (emphasis added).

obviously cannot form the basis for a disability benefits claim because an employee must have had an impairment for at least twelve months in order to be considered "disabled." 42 U.S.C. § 423(d)(1)(A).

The ALJ noted further that a review of the voluminous medical records in this case revealed little evidence pertaining to the relevant time period because Dr. Siegel was Dudelson's only treating physician during the period from March 1993 to March 1997. (Tr. 14). As the ALJ explained, she did not rely upon the additional opinion rendered by a state agency disability examiner, who found that Dudelson was not capable of performing sedentary work, because that opinion was based on "medical records detailing treatment after the date [Dudelson] was last insured." (Id. at 15). The ALJ, therefore, accorded sufficient weight to the opinions of Dudelson's treating physicians in holding that the record contained "no objective findings that indicate the presence of a totally disabling impairment" during the relevant period. (Id. at 16). Dudelson's claim to the contrary consequently is meritless.

2.    Analysis of Functional Limitations

Dudelson also argues that the ALJ improperly failed to consider her non-exertional impairments in the course of analyzing her RFC. (Pl.'s Reply Mem. at 12).

The regulations require an ALJ to consider all relevant evidence in the record, including the "nature and extent of [the claimant's] physical limitations," in the course of determining a claimant's RFC. 20 C.F.R. §§ 404.1545(a), (b); 416.945 (a), (b).

19

The physical limitations that can have an impact on a claimant's ability to perform past work include limits in walking and other "manipulative or postural functions, such as reaching, handling, stooping or crouching." Id. §§ 404.1545(b); 416.945(b).

Under the regulations, the ALJ also must analyze a claimant's RFC on a function-by-function basis. See Brown v. Barnhart, No. 01 Civ. 2962 (JG), 2002 WL 603044, at *5 & n.5 (E.D.N.Y. Apr. 15, 2002) (remand required by ALJ's failure to perform function-by-function analysis); Alwashie v. Apfel, No. 99 Civ. 8898 (MBM), 2001 WL 135768, at *4 (S.D.N.Y. Feb. 16, 2001) ("The RFC should be a function-by-function determination of the claimant's ability to do work-related physical activities such as sitting, standing, walking, carrying, lifting, or pulling . . . ."); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *3 (July 2, 1996) ("The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.").

ALJ Edgell expressly relied on Dr. Siegel's findings that Dudelson was capable of performing "work related activities" although she was limited to lifting and carrying only five pounds, to standing and/or walking for up to two hours per day, to

sitting for fewer than six hours per day, and to pushing and/or pulling devices by her inguinal hernia. (Tr. 16, 323). Indeed, the Medical Assessment of Employability form completed by Dr. Siegel in 1996, upon which the ALJ relied, indicated that Dudelson "was <u>not</u> limited in her ability to carry light objects, perform fine manipulations, push or pull light objects or stand for a short period of time." (<u>Id.</u> at 14, 341) (emphasis added).

The ALJ also found that Dudelson's "job as a technical writer required the performance of basic work activity consistent with sedentary work." (<u>Id.</u> at 16). Sedentary work is defined by the Commissioner as work which "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a); 416.967(a). The regulations promulgated by the Commissioner further note that a sedentary job typically requires occasional walking and standing. <u>Id.</u>

Here, Dudelson testified that her job as a technical writer required her to sit and draw diagrams and do "a little bit of writing" about computer programming subroutines. This description of her former job is consistent with the definition of sedentary work. <u>See</u> <u>id.</u>; <u>see also</u> U. S. Dep't of Labor 1 <u>Dictionary of Occupational Titles</u> 88, App. C 1012-13 (4th ed. 1991) (detailing the tasks typically performed by a writer for technical publications). The ALJ also noted, as had Dr. Siegel, that Dudelson's RFC was limited by her non-exertional impairment of being unable to tolerate exposure to "dust, heat [and] humidity." (Tr. 341). In that regard, the ALJ observed that Dudelson's

job as a technical writer required her to perform basic work activity which was consistent

with sedentary work and "did not require exposure to extremes of respiratory irritants."

(Id. at 16).  Indeed, Dudelson had testified to being able to work as a technical writer

from home, where she could presumably control the environmental allergens to which she

was exposed.  (Id. at 32).

Because the evidence in the record supported the ALJ's function-by-

function finding that Dudelson was capable of performing all of the tasks necessary to

engage in the sedentary job of technical writer, the conclusion that Dudelson could

perform her prior sedentary job, limited only by her sensitivity to respiratory irritants, was

not in error and does not warrant a remand.

Dudelson also claims that the ALJ failed to develop any vocational

evidence in the course of determining that she could perform sedentary work.  (Pl.'s

Mem. at 20).  As the Government correctly observes, however, there was no need for

such evidence in this case.  The ALJ determined that Dudelson had the RFC to perform

her past work as a technical writer and, therefore, was not disabled.  (Tr. 16).  This

constituted a denial of benefits at the fourth step of the five-step process described above.

At the fourth step, having determined that Dudelson could perform her past work, the

ALJ was under no duty to develop the record with respect to other work in the national

economy that Dudelson could perform.  Such an analysis is required only when a denial

of benefits is made at the fifth step of the process.  See Rosa, 168 F.3d at 77; DeChirico,

134 F.3d at 1180. Because that was not the situation here, the ALJ did not improperly fail to develop the record with respect to vocational evidence.

   3.    Credibility Determination

Dudelson also contends that the ALJ improperly analyzed the credibility of her testimony regarding her pain and symptoms. (Pl.'s Mem. at 21).

The Commissioner's regulations set forth a two-step process to evaluate a claimant's testimony regarding her symptoms. First, the ALJ must consider whether the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged by the claimant. Sarchese v. Barnhart, No. 01 Civ. 2172 (JG), 2002 WL 1732802, at *7 (E.D.N.Y. July 19, 2002) (citing SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996)); 20 C.F.R. §§ 404.1529(b), 416.929(b). Second, if the ALJ determines that the claimant is impaired, the ALJ then must evaluate the "intensity, persistence, and limiting effects" of the claimant's symptoms. Sarchese, 2002 WL 1732802, at *7 (internal quotation marks omitted); 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

If the claimant's statements about her symptoms are not substantiated by objective medical evidence, the ALJ must make a finding as to the claimant's credibility. Sarchese, 2002 WL 1732802, at *7; SSR 96-7p, 1996 WL 374186, at *2. Such an evaluation of a claimant's credibility is entitled to great deference if it is supported by substantial evidence. Bischof v. Apfel, 65 F. Supp. 2d 140, 147 (E.D.N.Y. 1999); see

also <u>Bomeisl v. Apfel</u>, No. 96 Civ. 9718 (MBM), 1998 WL 430547, at *6 (S.D.N.Y. July 30, 1998) ("findings [as to claimant's credibility] are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing").

In assessing the claimant's credibility, the ALJ must consider all of the evidence in the record and give specific reasons for the weight accorded to the claimant's testimony. <u>See</u> <u>Rivera v. Apfel</u>, No. 94 Civ. 5222 (MBM), 1999 WL 138920, at *8 (S.D.N.Y. Mar. 15, 1999) (ALJ must state specific reasons for rejecting claimant's statements as not credible); <u>Lugo v. Apfel</u>, 20 F. Supp. 2d 662, 663 (S.D.N.Y. 1998) (same); SSR 96-7p, 1996 WL 374186, at *4 ("When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."). The regulations require the ALJ to consider not only the objective medical evidence, but also:

a.   The individual's daily activities;

b.   The location, duration, frequency, and intensity of the individual's pain or other symptoms;

c.   Factors that precipitate and aggravate the symptoms;

d.   The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

e.   Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

24

f.    Any measures other than treatment the individual uses
      or has used to relieve pain or other symptoms . . . ; and

g.    Any other factors concerning the individual's
      functional limitations and restrictions due to pain or
      other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)).  See

also Sarchese, 2002 WL 1732802, at *7 (listing factors); Lewis v. Apfel, 62 F. Supp. 2d

648, 658 (N.D.N.Y. 1999) (same).

        Here, the ALJ found that the combination of conditions described by

Dudelson did not "'meet or equal' the criteria contained under the Listing of Impairments

of Appendix 1" of the Commissioner's regulations.  (Tr. 13).  In keeping with the

regulations, the ALJ also considered Dudelson's allegations of pain and functional

limitations, concluding that they were "not credible to the incapacitating extent alleged."

(Id. at 15).  In reaching this determination, the ALJ relied on Dr. Siegel's report stating

that Dudelson "was capable of performing some work activity," as well as the fact that his

records "reveal[ed] only sporadic medical treatment and no abnormal laboratory findings

during the alleged disability period."  (Id.).

        The ALJ also considered that "during the period in question, [Dudelson] . . .

did some occasional shopping and some light cooking," despite the fact that she testified

that her physical limitations "rendered her unable to perform basic work activities."  (Id.).

Dudelson also was able to attend monthly eviction proceedings in court.  (Id.).  On this

basis, the ALJ found "that [Dudelson's] testimony alleging an inability to work [was] not

supported by the objective medical evidence." (Id.).  The ALJ further found that

Dudelson's testimony regarding her limitations was not credible in light of the

inconsistencies between her testimony and the documentary evidence.  (Id.).  These

findings regarding Dudelson's credibility are consistent with the Commissioner's

regulations and are entitled to deference because the ALJ was in the best position to

assess Dudelson's demeanor.  Accordingly, contrary to Dudelson's suggestions, the

ALJ's determination that Dudelson lacked credibility is supported by substantial evidence

and should not be disturbed.

> B.    ALJ's Failure to Consider Dudelson's Mental Condition

Dudelson also contends that the ALJ erroneously disregarded her mental

illness.  (Pl.'s Mem. at 14-16).  Specifically, she points to the fact that the ALJ made "no

reference at all" to either Dudelson's claim of depression or her "significant psychiatric

history" supporting that claim.  (Id. at 14).

An ALJ must use a "special technique" to determine the severity of a

claimant's mental impairment.  20 C.F.R. §§ 404.1520a(a), 416.920a(a).  First, the ALJ

must evaluate the claimant's symptoms, as well as other signs and laboratory findings,

and determine whether the claimant has a "medically determinable mental impairment."

Id. §§ 404.1520a(b)(1), 416.920a(b)(1).  If a medically determinable impairment exists,

the ALJ must "rate the degree of functional limitation resulting from the impairment[]."

Id. §§ 404.1520a(b)(2), 416.920a(b)(2).  This requires the ALJ to examine all relevant

clinical and laboratory findings, as well as the effects of the symptoms on the claimant, the impact of medication and its side effects, and any other evidence relevant to the impairment and its treatment. Id. §§ 404.1520a(c)(1), 416.920a(c)(1).

The ALJ must rate the degree of the claimant's functional limitation in four specific areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. §§ 404.1520a(c)(3), 416.920a(c)(3). These four areas are referred to as "Paragraph B" criteria. See id. pt. 404, subpt. P, app. 1, § 12.00C. The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." Id. §§ 404.1520a(c)(4), 416.920a(c)(4). If the first three areas are rated as "none" or "mild," and the fourth as "none," the ALJ will conclude that the mental impairment is not severe "unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." Id. §§ 404.1520a(d)(1), 416.920a(d)(1). If the claimant's impairment is found to be severe, the ALJ will then consider whether it meets the criteria of a listed impairment.

In her decision, the ALJ did not make a single reference to Dudelson's claim of depression, nor did she attempt to substantiate the claim through the production of additional documentary evidence. The ALJ also failed to mention the fact that Dudelson had testified that she was taking a series of anti-depressant and anti-anxiety

27

medications throughout the relevant period. (See, e.g., Tr. 43). The ALJ also failed to consider what the side effects, if any, of those drugs were.

Even though much of the evidence submitted by Dudelson at the hearing related to treatment occurring after the relevant period, there is some documentation to support her claim that she suffered from a disabling mental illness during that period. (See, e.g., Tr. 99, 218-20, 247-53, 354, 370). This, in turn, triggered an affirmative duty on the part of the ALJ to develop the record. As the Second Circuit has explained,

> even if the clinical findings were inadequate, it was the ALJ's duty to seek additional information [from the treating physician] sua sponte. See Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996) ("[T]he ALJ generally has an affirmative obligation to develop the administrative record. This duty exists even when the claimant is represented by counsel . . .").

Schaal, 134 F.3d at 505.

Because the ALJ did not properly develop the record regarding Dudelson's claim of mental impairment, this case should be remanded for further proceedings.

C.    Proper Relief

Although the ALJ's detailed decision failed to develop the record fully in only one area, Dudelson contends that the case should be remanded "solely for the purpose of calculating benefits," or, in the alternative, remanded so that the Commissioner may consider new evidence submitted by Dudelson to the Court after the hearing before the ALJ. (Pl.'s Mem. at 16, 22). The new evidence that Dudelson seeks to

bring before the Commissioner is a letter, dated May 21, 2004, from her treating

psychologist, Maureen McSweeney, Ph.D.  (See Decl. of Ruth Dudelson, dated May 21,

2004, Ex. 1).

   Section 405(g) of Title 42, United States Code, provides, in pertinent part,

that a court may order that additional evidence be considered by the Commissioner upon

remand "only upon a showing that there is new evidence which is material and that there

is good cause for the failure to incorporate such evidence into the record in a prior

proceeding."  The Second Circuit has articulated a three-part test that Dudelson therefore

must satisfy in order to have her "new" evidence considered at a resumed hearing.  The

evidence must be "(1) new and not merely cumulative of what is already in the record;

(2) material, that is, both relevant to the claimant's condition during the time period for

which benefits were denied and probative; and the claimant must show (3) good cause for

her failure to present the evidence earlier."  Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir.

1988) (internal citations omitted).  The concept of materiality also requires "a reasonable

possibility that the new evidence would have influenced the [Commissioner] to decide

claimant's application differently."  Pollard v. Halter, 377 F.3d 183, 193 (2d Cir. 2004)

(alteration in original).

   Because Dr. McSweeney's letter did not exist at the time of the hearing

before the ALJ, there is no question that the evidence is "new."  Turning to the materiality

of the information in the letter, Dr. McSweeney indicated that Dudelson has been a

patient of hers since December 19, 2003, and that it was her opinion that "Dudelson has had a long standing psychiatric history." (Dudelson Decl. Ex. 1). Additionally, Dr. McSweeney indicated that she

> ha[d] given Ms. Dudelson a primary Axis I diagnosis of 296.40, which is Bipolar 1 disorder, . . . with a secondary diagnosis of 300.01, panic disorder; her Axis III is chronic pain condition due to gynecological and orthopedic conditions; her level of functioning is 55, which indicated fair to poor coping, as demonstrated by mood swings, occasional suicidal ideations, and poor sleep.

(Id.).

As the Commissioner's reply memorandum notes, a Global Assessment of Functionality ("GAF") score of 55 does not suggest problems so serious that Dudelson could not work. (See Def.'s Reply Mem. at 10 n.3 & Ex. A). On the other hand, Dr. McSweeney further opined that "it would be considered impossible that Ms. Dudelson would suddenly develop a bipolar disorder in her 40's" and that she "[m]ost likely . . . has had bipolar disorder since childhood." (Id.). This reference to the possible life-long nature of Dudelson's mental condition renders the new evidence relevant to the time period for which Dudelson is seeking benefits.

Although the McSweeney letter was written after the ALJ issued her decision, "this does not necessarily mean that it had no bearing on the Commissioner's evaluation of [Dudelson's] claims." Pollard, 377 F.3d at 193. The letter, in fact, supports Dudelson's contention that she suffered from depression during the relevant time period.

30

As the Second Circuit has observed, subsequent evidence that may disclose the "severity and continuity of impairments existing [during the relevant time period] may identify additional impairments which could reasonably be presumed to have been present." Lisa v. Sec'y of Dep't of Health and Human Serv., 940 F.2d 40, 44 (2d Cir. 1991). The McSweeney letter does precisely that.

Turning to Dudelson's good cause for failing to submit this evidence to the ALJ, it would have been impossible for her to do so in light of the fact that it did not exist at the time of the hearing. See Pollard, 377 F.3d at 193 ("Because the new evidence submitted by [the claimant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ.").

Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's final decision has the power "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for rehearing." A remand solely for the calculation of benefits is warranted when a rehearing would serve no purpose. See Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) (quoting Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998)). However, if the record is incomplete or the ALJ has applied the wrong legal standard, the case should be remanded for a rehearing. See Curry, 209 F.3d at 124; Zimmerman v. Massanari, 212 F. Supp. 2d 127, 133-34 (W.D.N.Y. 2002).

Here, the ALJ's decision failed to comply with the Commissioner's regulations requiring that the record be fully developed with respect to Dudelson's alleged mental impairment. Since the record is essentially silent as to this subject, this Court clearly cannot conclude that the ALJ will necessarily find, after additional inquiry, that Dudelson was disabled during the relevant period and is therefore entitled to benefits. Accordingly, the case should be remanded to the Commissioner for a further hearing, not simply for the calculation of benefits. At the resumed hearing the ALJ should develop the record concerning Dudelson's alleged mental impairment and consider the McSweeney letter.

In making this recommendation, I am mindful of the delays endured by Dudelson during the disability determination process, her subsequent appeals, and the pendency of this case. However, delay alone is not a sufficient basis for the Court to remand a Social Security case solely for the calculation of benefits. <u>Bischof</u>, 65 F. Supp. 2d at 148 (citing <u>Bush v. Shalala</u>, 94 F.3d 40, 46 (2d Cir. 1996)). Nonetheless, because of the prior delays, the Commissioner should be instructed to make every effort to expedite the rehearing process upon remand.

V.    <u>Conclusion</u>

Dudelson's motion for judgment on the pleadings should be granted insofar as it seeks remand to the Commissioner for further proceedings in accordance with this Report and Recommendation, and the Commissioner's cross-motion should be denied.

Additionally, the Commissioner should be directed to expedite the hearing process following remand. Finally, if these recommendations are accepted, this case should be closed.

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Richard C. Casey and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Casey. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:      New York, New York
            May 10, 2005

                                    _____
                                         FRANK MAAS
                                    United States Magistrate Judge

33

Copies to:

Richard C. Casey
United States District Judge

Carolyn A. Kubitschek, Esq.
Lansner & Kubitschek
325 Broadway, Suite 201
New York, new York 10007
(212) 349-0694 (fax)

Lorraine S. Novinski, Esq./Susan Branagan, Esq.
Assistant United States Attorney
33 Whitehall Street 8th Floor
New York, New York 10004
(212) 637-2750 (fax)